1

2

3

4

5                                UNITED STATES DISTRICT COURT

6                               NORTHERN DISTRICT OF CALIFORNIA

7

8    JULIETA LUDOVICO,                              No. C-12-4363 EMC

9              Plaintiff,

10        v.                                        **ORDER GRANTING IN PART AND
                                                    DENYING IN PART DEFENDANT'S
11   KAISER PERMANENTE *aka* THE                    MOTION FOR SUMMARY JUDGMENT**
     PERMANENTE MEDICAL GROUP, INC.,
12                                                  **(Docket No. 61)**
             Defendant.
13
     _____/
14

15

16                              I.    **INTRODUCTION**

17        Plaintiff Julieta G. Ludovico, a nurse currently employed by Defendant The Permanente

18   Medical Group, Inc. ("TPMG"), filed the instant action against TPMG alleging claims for sexual

19   harassment in violation of Title VII and the California Fair Employment and Housing Act

20   ("FEHA").  Plaintiff alleges a single incident of a co-worker assaulting her and making a sexually

21   inappropriate statement.  In addition to her Title VII and FEHA claims resulting from this incident,

22   Plaintiff asserts that she suffered a mental disability as a result of the sexual harassment and that

23   TPMG (1) failed to provide her a reasonable accommodation in violation of the Americans with

24   Disabilities Act ("ADA") and FEHA and (2) retaliated against her when she complained of this

25   disability discrimination.  Plaintiff also brings unrelated disability discrimination and retaliation

26   claims arising out of TPMG's alleged failure to accommodate a physical disability Plaintiff suffered

27   as a result of a workplace injury.  TPMG has moved for summary judgment on all claims.

28

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

For the following reasons, the Court **GRANTS** TPMG's motion to the extent it seeks summary judgment on Plaintiff's retaliation claims as well as her claims arising out of the alleged sexual harassment incident.  However, the Court **DENIES** the motion to the extent it seeks summary judgment as to Plaintiff's disability discrimination claims predicated on Plaintiff's physical disability.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Julieta G. Ludovico is a registered nurse.  Declaration of Julieta G. Ludovico ¶ 2 ("Ludovico Decl."), Docket No. 69.  For approximately thirteen years, Plaintiff worked as an emergency room nurse in TPMG's Vallejo facility.  *Id.*  She continues to work for TPMG as an advice nurse in the Vallejo Call Center.  *Id.* ¶ 64.

A.   Alleged Sexual Harassment and TPMG's Response

On February 17, 2010, at approximately 2:00 a.m., Plaintiff was at the nurses' desk in the emergency department in the Vallejo facility.  Docket No. 65-1, at 2.  An x-ray technician named Kevin was walking by the nurses' desk when Plaintiff and one of the other nurses told him "hi" as he walked by.  *Id.*  When Plaintiff said hi, she touched Kevin on his arm.  Docket No. 65-1; Deposition of Julieta G. Ludovico at 275:9-21 ("Ludovico Depo."), Docket No. 66-2.  In response, Kevin grabbed Plaintiff by her right shoulder, "pulled [her] to him so that [she] was not free to leave, and told [her] he would take his big wet tongue and shove it into my mouth a few times, and he was sure I would like that."  Ludovico Decl. ¶ 5.  This incident was observed by multiple witnesses, with only slight differences in their accounts.  For instance, a nurse at the nurses' desk reported that she "heard Kevin tell Julie he wanted to put his tongue in her mouth.  I am not 100% [sic] as to what action he took.  There was some contact, but not sure how much."  Docket No. 65-1, at 12.  Similarly, an emergency room doctor stated that he observed Plaintiff tell Kevin that she did not like something "at all" to which Kevin replied "[w]ell, then you'll really like it when I shove my big wet tongue into your mouth" and then laughed.  *Id.* at 14.  The doctor reported that Plaintiff responded that she did "not appreciate the way she was touched nor the way she was talked to afterwards."  *Id.*

Plaintiff immediately reported the incident to the nurse shift supervisor, Angela Wilson, as an act of sexual harassment.  *Id.* at 4.  Plaintiff stated that the comment "made her feel nasty and

United States District Court
For the Northern District of California

unsafe" and she then "role played the whole incident" with Nurse Wilson to "figure out what she

had done or said to make him approach her in that manner." *Id.* Plaintiff also reported that she now

felt "unsafe to take a [patient] to the radiology dep[artment] at night by herself." *Id.*[1] Nurse Wilson

asked whether Plaintiff needed to have another nurse take her shift, and Plaintiff declined. *Id.* She

stated that she just needed a "few minutes to get herself together." *Id.*

On the day of the incident, Plaintiff met with Janis Lacy, an HR Employee and Labor

Relations Consultant for TPMG. Declaration of Janis Lacy ¶ 1, 4 ("Lacy Decl."), Docket No. 65.

Ms. Lacy took Plaintiff's statement, met with her for 45 minutes, and took notes of the meeting. *Id.*

¶ 4. These notes, and Plaintiff's statement, largely corroborate the above accounts of the incident,

with minor differences. *Id.*; Docket No. 65-1, at 6. On February 22, 2010, Ms. Lacy met with

Kevin, his two radiology managers, and his union representative. Lacy Decl. ¶ 5. Kevin's account

of the incident differed in material respects. He told Ms. Lacy that he and Plaintiff "often joked and

laughed with one another" and that on the day in question, he had returned from a vacation and

Plaintiff asked him for a hug. *Id.* According to Ms. Lacy's notes he responded by stating something

to the effect of "I'll give you a kiss – come here, I'll kiss you in the mouth." Docket No. 65-1, at 9.

Kevin apparently told Ms. Lacy he "would have apologized" if Plaintiff had expressed any concern

about his statement. Lacy Decl. ¶ 5. He claimed both laughed and went on their way. Docket No.

65-1, at 9-10.

Ms. Lacy reports that her investigation ultimately determined that Kevin had engaged in an

"inappropriate conversation" but that there was nothing to substantiate Plaintiff's claim that Kevin

---

[1] Plaintiff describes in her declaration that the taking a patient to radiology required the escorting nurse to go down an isolated hallway where the nurse would be alone with the patient and the radiology technician. Ludovico Decl. ¶ 4. Further, the nurse would be required to stay in a small booth with the x-ray technician while the x-rays or CT scans were being done. *Id.* While not expressly stated by Plaintiff in her declaration, it can be inferred from the record that Plaintiff's fear in escorting patients to radiology in the wake of the February 17, 2010 incident was a result of the prospect of being alone in an isolated area with Kevin.

United States District Court

For the Northern District of California

1 had grabbed her arm in a forceful manner.  *Id.* ¶ 7.  Kevin was suspended for two days, and ordered

2 to avoid all contact with Plaintiff.  *Id.*[2]

3   On March 17, 2010, Plaintiff states that she encountered Kevin in the emergency department

4 and, while nothing inappropriate occurred, she was "frozen with fear of another assault."  *Id.* ¶ 9.

5 Plaintiff called Ms. Lacy to inform her that Kevin was working in the emergency department, but

6 did not receive a response.  *Id.*  Her next scheduled day of work in the emergency department in

7 Vallejo was March 24, 2010 – however, she had not heard back from Ms. Lacy regarding her March

8 17, 2010 complaint.  *Id.* ¶ 11.  Plaintiff asserts she sent an email to Ms. Lacy and the ER Nursing

9 Director on March 24, 2010 complaining about having to still work in the area as Kevin and her fear

10 of being attacked again and her need for "justice."  Docket No. 70, at 8.  Ms. Lacy responded, in

11 part, by stating:

12     My advice to you is to continue working as you normally would and
      report to management or myself any instances that occur.  We agree

13     with you that this is a very important issue, and I can assure you that
      your complaint was not neglected.

14

15 *Id.*

16   The following day, March 25, 2010, a meeting was held between management of the

17 emergency and radiology departments, representatives of the CNA (the nursing union),

18 representatives of UHW (Kevin's union), and Plaintiff to discuss her concerns.  Lacy Decl. ¶ 9.

19 During this meeting, the parties discussed the fact that Kevin's duties as a radiologist technician

20 often required him to go into the emergency department and that Plaintiff's nurse duties frequently

21 required her to take patients to the radiology department, thus causing Plaintiff fear.  Docket No. 65-

22 1, at 16.  Plaintiff expressed an interest in being transferred if it would not be possible to avoid

23 contact with Kevin.  *Id.*  Ultimately, an agreement was reached which provided that Kevin: (1) was

24

25   [2] Plaintiff has introduced the declaration of Barbara Brooks – a nurse in the same emergency
room in which Plaintiff worked at the time of the incident.  Declaration of Barbara Brooks ¶ 1

26 ("Brooks Decl."), Docket No. 80.  She claims that during her time in the department, she has
witnessed Kevin display "aggressive, intimidating and verbally abusive behavior toward many of the

27 staff in the Department, including myself."  *Id.* ¶ 3.  She further claims to have been "aware of
complaints made to Kaiser Management about this inappropriate behavior."  *Id.*  She further provides

28 an example of an allegedly aggressive encounter involving Kevin which resulted in her complaining
to her manager about Kevin's behavior, but this incident was not sexual in nature.

United States District Court

For the Northern District of California

1    to avoid any contact with Plaintiff both inside and outside of work; (2) should "go out of [his] way

2    when possible to avoid seeing her"; (3) could not go into the emergency department break room; (3)

3    would have to call the emergency department supervisor before coming to the department to do

4    radiological exams and would be supervised while there and (4) would review the harassment policy

5    and acknowledge he understood the policy. *Id.* at 22.

6         Plaintiff contends that TPMG's failure to remove Kevin from her worksite required her to

7    "rearrange [her] work activities in order to accommodate Kevin so that [they] did not interact."

8    Ludovico Decl. ¶ 13.  For example, on May 31, 2010, Plaintiff was informed by her supervisor that

9    she had to stop working on what she was doing and go into a conference room for around 20

10   minutes while Kevin was working in the area.  *Id.*  Plaintiff objected, but the supervisor informed

11   her there was nothing she could do.

12        In her declaration, Plaintiff takes issue with TPMG's failure to transfer or otherwise remove

13   Kevin from her work area.  *See, e.g.* Ludovico Decl. ¶ 8 (claiming there were "several other Kaiser

14   possible facilities . . . to which Kevin could have been transferred").  However, as just discussed,

15   Plaintiff agreed, at least initially, to a resolution that did not provide for Kevin being transferred.

16   Further, in her deposition, Plaintiff stated that she never requested that Kevin be transferred or fired.

17   Ludovico Depo. at 299:20-25.

18        On April 13 or 14, 2010, Plaintiff was instructed by her manager to transfer a patient to a

19   hospital bed for admission – a task that would have required her to go, with the patient, by the

20   radiology department.  Ludovico Decl. ¶ 16; Lacy Decl. ¶ 14.  Because of Plaintiff's concerns, her

21   manager had another nurse escort the patient because, according to her report she did "not want

22   [Plaintiff] to feel unsafe."  Docket No. 65-1, at 26.  Approximately 5 minutes later, Plaintiff

23   informed her manager that she could not finish her shift and left work early.  Lacy Decl. ¶ 14.

24   During this exchange, Plaintiff was tearful and angry that the "management team" was not holding

25   up the "agreement" that had been entered.  Docket No. 65-1, at 26, 27.  The emergency department

26   manager contacted Plaintiff later that afternoon to see how she was doing and to determine whether

27   she would be able to come into work or would require sick leave.  Lacy Decl. ¶ 15.  The department

28   manager indicated that the conversation with Plaintiff was "difficult and her sentences were very

disjointed."  Docket No. 65-1, at 30.  She relayed her fear and feeling of being "trapped and scared" while at work.  *Id.*  She also indicated that she had been advised to assert workers' compensation and see a doctor.  *Id.*; Lacy Decl. ¶ 15.

That same day, Plaintiff called the Kaiser advice nurse line and set a date for an appointment to see a doctor for anxiety and emotional distress.  Ludovico Decl. ¶ 17.  On April 19, she met with Dr. Rosen who indicated that Plaintiff would "hopefully" be able to return to work on May 10.  Docket No. 70, at 17.  He further indicated as a treatment plan "relaxation to [reduce] stress" and "anti-anxiety medication."  *Id.* at 18.

On April 27, 2010, Plaintiff filed a charge with the EEOC alleging discrimination on the basis of race, national origin, and age.  Ludovico Decl. ¶ 18; Docket No. 70, at 20.

On April 30, a meeting was held with TPMG management, Plaintiff, and her union representatives.  Lacy Decl. ¶ 18; Docket No. 65-1, at 39.  During this meeting, Plaintiff stated that "the accommodations provided by the Emergency Department and Xray Departments were not workable, and then concluded with the request that the employee in Radiology either have his employment terminated or be permanently transferred to a different facility.  If we were unable to fulfill this request, [Plaintiff] requested to transfer to the Vacaville Emergency Department."  Docket No. 65-1, at 39.  On June 1, 2010, Ms. Lacy sent an e-mail to Plaintiff's union representative, responding to Plaintiff's "request to have the radiology employee terminated or moved to another facility."  Docket No. 65-1, at 37; Lacy Decl. ¶ 19.  In this e-mail, Ms. Lacy stated: "Based on the findings of the investigation, the appropriate action has been taken with regard to the radiology employee.  There will be no further action taken toward that employee with regard to this complaint."  Docket No. 65-1, at 37.[3]

Plaintiff saw Dr. Wright on May 6, 2010 as part of her workers' compensation claim.  Ludovico Decl. ¶ 19.  He diagnosed Plaintiff with posttraumatic stress disorder and stated that she could return to work with "no restrictions on 7/12/2010."  Docket No. 70, at 22.  He further

---

[3] In the moving papers, TPMG asserts it would have been a violation of a collective bargaining agreement to subject Kevin to further adverse employment actions.

United States District Court

For the Northern District of California

indicated that she could do modified work between May 11, 2010 through July 11, 2010, but indicated the following restriction:

> This [patient] cannot be allowed to work in the Emergency Room of KSR Hosp. Vallejo so long as "Kevin" (X-ray tech) is working in that Building.  The preferable solution is to transfer him so that the [patient] does not feel further victimized by her being transferred as she is the clear victim of workplace violence.

*Id.*  Finally, the doctor noted that Plaintiff was "fully able to return to work at her other job at the David Grant Medical Center in Travuis, Ca."  *Id.*  Plaintiff states that in response to the doctor's note she was "taken off of the Emergency Department's work schedule altogether and placed off work for the two months [May through July 2010]."  Ludovico Decl. ¶ 20.

In late June 2010, Plaintiff accepted, through her union representative, a transfer to an emergency department nurse position at TPMG's Vacaville facility.  Docket No. 65-1 at 42.  She states that this position was "more than a half hour's drive away from [her] house, and which [she] was required to travel at night due to [her] shift."  Ludovico Decl. ¶ 23.  Nonetheless, this was the action that she had previously requested in the event that Kevin was not transferred or terminated.  *See* Docket No. 65-1, at 16, 39.

On September 17, 2010, Plaintiff filed a charge with the EEOC alleging retaliation on the basis of her having filed the earlier discrimination charge.  Docket No. 71, at 2.  The charge specifically points to TPMG's alleged failure to accommodate her psychological disability as reflected in Dr. Wright's note on May 6, 2010.  *Id.*

B.    Ms. Ludovico's Physical Disability and TPMG's Response

On November 3, 2011, Plaintiff injured her neck, shoulder, arm, and back while moving a patient from his bed at the TPMG Vacaville facility.  Ludovico Decl. ¶ 26.  Plaintiff asserts that her injury was caused by the failure of available staff to assist her in violation of hospital protocol and safety standards.  *Id.*  The emergency room doctor examined her and placed her off work for the following day.  *Id.*  She continued to experience pain in her shoulder and back and was seen by Dr. Samuel Brown on November 7, 2011.  *Id.* ¶ 27.  Dr. Brown diagnosed Ms. Ludovico with "sprain/strain, upper arm, back, strained shoulder, trapezius muscle."  *Id.*  Eventually, Dr. Brown placed Ms. Ludovico on modified duty through December 25, 2011 with limitations including

7

limited reaching above her right shoulder; limited repetitive right hand motion; and no lifting, carrying, pushing, or pulling more than five pounds.  *Id.*  Plaintiff filed a workers' compensation claim and notified the emergency department manager, Kate Hesse, about the incident and complained about the "unsafe working conditions that contributed to [her] injury."  *Id.* ¶ 28.

### 1.   TPMG's Initial Response

When Plaintiff returned to work, she was "assigned menial tasks like greeter, which embarrassed and humiliated [her], or assigned to sit in a room at a computer and forbidden to be out on the floor."  *Id.* ¶ 29.  According to the "diary" of Ralph McMillan's – the Disability Manager assigned to Plaintiff's case – Plaintiff  was assigned to the greeter position by Ms. Hesse until it was discovered that the position would not work with the limitation related to the use of her upper right extremity.  Docket No. 64-1, at 2.  Eventually, Mr. McMillan and Ms. Hesse assigned Plaintiff to perform quality assurance and chart review for the trauma department.  *Id.*; Ludovico Decl. ¶ 29.

On December 16, 2011, Mr. McMillan met with Plaintiff and went over a Temporary Transitional Work Agreement ("TTWA") which Plaintiff then signed.  Ludovico Decl. ¶ 30; Docket No. 64-1, at 2.  According to Ms. Claudia Shafer, a Human Resources Consultant and former Manager of Disability Consulting, TTWAs do not provide for permanent work or positions, but rather provide "temporary tasks offered to assist disabled employees while they transition back to a permanent assignment."  Declaration of Claudia Shafer ¶¶ 1-2, 5, Docket No. 63-1.  These agreements are for 90 days, but there are limited conditions under which they may be extended for 90 additional days (for example, if a "medical event" is expected, such as surgery).  *Id.* ¶ 5.  They are designed to provide temporary work to injured employees while they transition into their regular positions.  McMillan Decl. ¶ 5.

On December 27, 2011, Dr. Brown returned Plaintiff to work without any restriction. Ludovico Decl. ¶ 31; Docket No. 71, at 27 (Dr. Brown note indicating that the "patient was evaluated and deemed able to return to work at full capacity on 12/27/2011").  Her tasks as an emergency room nurse required her to be able to lift patients into their bed, physically support them, pushing and pulling wheelchairs/gurney/carts, and reaching for IV bags.  Ludovico Decl. ¶ 31.  The day after Plaintiff returned to work, she could not perform these tasks without excruciating pain in

United States District Court

For the Northern District of California

1    her arm, neck and back.  *Id.*  She again saw Dr. Brown on December 30, 2011, and the doctor

2    reinstated her previous work restrictions on lifting, pulling, pushing, and repetitive arm motions

3    through January 6, 2012.  *Id.*; Docket No. 71, at 29.  In her deposition, Plaintiff states she then

4    switched doctors partly because Dr. Brown "kept sending [her] back with no restrictions" even

5    though she was still hurting."  Ludovico Depo. at 90:1-21.

6         2.    Plaintiff's Work Status Through 2012

7         Plaintiff's workers' compensation attorney referred Plaintiff to Dr. Douglas Grant of the

8    Integrated Pain Management Medical Group on February 2, 2012.  Ludovico Decl. ¶ 32; Ludovico

9    Depo. at 90:18-21.  On February 6, Dr. Grant issued an order describing certain required work

10   modifications for Plaintiff, specifically: (1) no direct patient care; (2) no lifting over 15 pounds; (3)

11   no pushing/pulling more than 15 pounds, no "overhead activity"; and (4) no standing/walking for

12   more than 75% of a shift.  Docket No. 72, at 2.  During this time, Plaintiff continued working on the

13   temporary work under the TTWA.

14       On April 16, 2012, Mr. McMillan and Ms. Hesse met with Plaintiff to review her progress.

15   McMillan Decl. ¶ 8.  According to the diary notes of the meeting, Plaintiff stated that she was "no

16   longer interested" in modified work (Plaintiff disputes this) and also stated that her condition had

17   not gotten better and she remained in pain while performing certain tasks.  Docket No. 64-1, at 3.

18   She further stated that she was interested in searching for "other jobs within Kaiser" and was

19   awaiting an MRI.  *Id.*  On April 16, Mr. McMillan told Plaintiff that they would "interrupt

20   transitional work" and be placed on industrial leave, but that Plaintiff could "elect to integrate her

21   sick and or vacation with her industrial leave."  *Id.*  Plaintiff was given Mr. McMillan's and Ms.

22   Hesse's contact information and told to provide them with updates and medical notes as her

23   treatment progressed.  McMillan Decl. ¶ 9; Ludovico Depo. at 116:11-117:8.  Mr. McMillan asserts

24   that Plaintiff's transitional, temporary work was interrupted because Plaintiff had an MRI and

25   surgery scheduled.  McMillan Decl. ¶ 9.  Plaintiff disputes this, claiming that surgery was never

26   discussed or scheduled.  Ludovico Decl. ¶ 35.

27       In the months that followed, Plaintiff kept TPMG personnel updated on her medical

28   restrictions by submitting work status forms.  Docket No. 64-1, at 3; McMillan Decl. ¶ 10.  From

9

United States District Court

For the Northern District of California

1    April through August, the doctor reports continued to indicate that Plaintiff continued to have

2    restrictions on her ability to work, including "[n]o direct patient care" among limitations on her

3    ability to lift, push, and pull.  Docket No. 72, at 7-10.  Plaintiff continued to treat over these months,

4    and she stated in her deposition that it was, at that time, her intention to return to her position in the

5    emergency room.  Ludovico Depo. at 118:10-120:11).  In September 2012, Dr. Grant stated that "[i]f

6    there are no modified duties available, then she would be administratively at Total Temporary

7    Disability Status."  Docket No. 72, at 11.  While Ms. Ludovico continued to send her doctor notes to

8    Ms. McMillan and her manager, she asserts that she was never contacted by anyone with TPMG.

9    Ludovico Decl. ¶ 35.  Mr. McMillan states that at no point from April 2012 through September 2012

10   did Ms. Ludovico express dissatisfaction with TPMG's response to her disability or suggest an

11   accommodation as an alternative to medical leave.  McMillan Decl. ¶ 11.

12       On July 27, 2012, the disability management diary states that a conference call occurred

13   between Claudia Shafer and other parties.  It states that "[a]ll parties agreed DM can move forward

14   with IP [interactive process] and offer engagement as her limitations remain the same."  Docket No.

15   63-1, at 3.  It further stated that "Ralph to move forward with engagement to obtain actionable

16   restrictions as her restrictions remain the same period for a period of time."  *Id.*  Nearly two months

17   passed until the next entry in the diary, dated September 24, 2012.  That entry indicates that a letter

18   from Plaintiff's counsel was forwarded to Ms. Shafer asserting that TPMG had "failed to offer the IP

19   [interactive process]."  *Id.*  Ms. Shafer indicated that she "[s]ent e-mail to Ralph requesting status on

20   the friendly engagement letter to employee offering the IP as she is not MMI [maximum medical

21   improvement]."  *Id.*  Mr. McMillan replied:

22              Regarding the case; Julieta had an injury and accommodated for about
              150-160 days.  We interrupted [temporary work] because I was
23              advised by Athens that surgery may happen after Julieta's MRI and
              wanted to save days on the back end.

24
              Prior to my leave[4] we received the OK to reach out to Julieta and send
25              our friendly engagement letter.  Unfortunately I drafted a letter but
              placed off work.  I will finish the letter and send.
26

27   _____

28          [4] Mr. McMillan apparently took medical leave for a short period of time in August and
     September 2012.

10

**United States District Court**
For the Northern District of California

1  Docket No. 63-1, at 4.  This letter was sent the following day.  *Id.*

2       The engagement letter stated that Mr. McMillan's role was to "ensure that we have explored

3  all alternatives so you can return to work at the earliest possible time."  Docket No. 73, at 6.

4  Additionally, it stated that if there were "current limitations affecting your ability to return you to

5  your current position, we will work with you to determine if there are accommodation(s) that would

6  allow you to return with or without a reasonable accommodation."  *Id.*  It further stated that "we

7  would like to engage with you and explore the interactive process in order to determine if your

8  condition has changed such that you can return to work with or without a reasonable

9  accommodation."  *Id.*  Further, the letter requested information as to the status of her recovery, when

10  she could be expected to return to work; it also requested that Dr. Grant complete a "Reasonable

11  Accommodation Request Medical Certification" ("RAMC") form.  *Id.*  Finally, it stated that Plaintiff

12  should contact Mr. McMillan to "request a reasonable accommodation."  *Id.*  Plaintiff testified that,

13  at this time (September and October 2012), she still intended to return to her staff nurse position in

14  the emergency department.  Ludovico Depo. at 132:14-133:7.

15       On October 12, 2012, Plaintiff returned the requested RAMC form, filled out by Dr. Grant.

16  Docket No. 74.  It re-affirmed Plaintiff's prior limitations, with one slight change.  Instead of stating

17  "no direct patient care," Dr. Grant now indicated "no direct patient ***care/contact***."  Docket No. 74, at

18  4 (emphasis added).  Finally, Dr. Grant indicated that these limitations were "subject to change after

19  review of AME Dr. Lavorgna's report that is pending."  *Id.*  Dr. Lavorgna's report was completed on

20  October 23, 2012.  Docket No. 74, at 19.  Dr. Lavorgna diagnosed Plaintiff with "[r]ight shoulder

21  impingement syndrom."  *Id.* at 17.  He further stated that her "work restrictions . . . can be described

22  as permanent work restrictions within reasonable medical probability."  *Id.* at 18.  At the same time,

23  he stated that her "condition regarding her work injury . . . has not reached a permanent and

24  stationary phase on a medical basis."  *Id.*  He concluded that "[a]t the time Dr. Grant decides the

25  patient's condition has reached maximum medical improvement, a reexamination will be indicated."

26  *Id.*

27       On October 26, 2012, Plaintiff emailed Mr. McMillan asking for an "update" and stating that

28  she was "so looking forward to get back to work."  Docket No. 74, at 9.  She listed her prior work

experience and stated that she hoped this would "help [him] find [her] a position with restrictions." *Id.* Mr. McMillan responded on October 29, 2012, stating that his role was to "ensure that we have explored all alternatives so you can return to work at the earliest possible time." *Id.* at 8. He then stated that if she had "current limitations affecting your ability to return to *your current* position, we will work with you to determine if there are accommodation(s) that would allow you to return with or without a reasonable accommodation." *Id.* Finally, he told Plaintiff that if she was searching for a "new position," she should prepare a resume and use TPMG's job website to create a profile and apply for the positions online. *Id.*

On October 31, 2012, Plaintiff again e-mailed Mr. McMillan requesting a meeting with him and "whoever has the ability to return me to work with 'work restrictions.'" *Id.* at 8. She further indicated that it had been "over two weeks since I have submitted the Doctor's report to you per your request. I would like a quick resolution so I can go back to work." *Id.* Specifically, she requested doing the same quality assurance work she did for the trauma department as she had done immediately after her injury. *Id.*

On November 8, 2012, Dr Grant issued a report indicating that Ms. Ludovico was "[p]ermanent and stationary" with the following work restrictions: (1) no pushing or pulling more than 15 pounds, (2) no direct patient care (with patient "contact" being omitted), (3) no driving for more than 30 minutes at a time, and (4) no repetitive movements in right upper extremity. Docket No. 75, at 2. Four days later, Mr. McMillan received an email from the workers' compensation adjuster at Athens, Jay Navat. McMillan Decl. ¶ 17. This e-mail informed Mr. McMillan that he had retained an outside consultant (DMG) to assist in "searching for modified alternative work for Ms. Ludovico." *Id.*

On December 10, 2012, nearly six weeks after Plaintiff requested a meeting, a meeting was held with Ms. Hesse, the emergency department manager; Ms. Hope Darrow the emergency department director; Plaintiff; her union representative; Gretchen Scott, a representative with DMG; and Mr. McMillan. McMillan Decl. ¶ 18; Docket No. 64-1, at 6. The parties discussed the "no direct patient care advised" limitation. Ms. Scott and Ms. Hesse explained that "providing direct patient care is an essential function of the job for a Staff Nurse II in the Emergency Clinic and it

1   cannot be removed." *Id.* Plaintiff, Ms. Hesse, and the union representative were asked by DMG and

2   Mr. McMillan whether there was a "specific piece of direct patient care that did not fit within the

3   physical restrictions provided," but Ms. Ludovico indicated she "cannot perform direct patient care

4   anymore because there are 'too many unknowns'" and that she had "hurt herself enough doing this

5   job." Docket No. 64-1, at 7. DMG indicated that it would "review current openings independently

6   and provide the information to Ms. Ludovico." *Id.*

7          Two days later, Plaintiff emailed Gretchen Scott, the DMG representative, stating that she

8   had searched the TPMG website for positions and "did not find anything that is suitable within my

9   restriction." Docket No. 75, at 9. She noted that most of the positions required direct patient care

10  "such as turning, pulling, pushing, lifting" and other tasks which required "constant maneuvering

11  with [her] right arms." *Id.* She indicated that if there were "any position in clinic that does not

12  require[] the above, I am willing to try. If they will accommodate me with my restrictions, I am

13  willing." *Id.* She concluded saying that she "love[s] patient care, I am capable of doing Advice

14  Nurse. Please help me find a job." *Id.* Ms. Scott replied on December 18, 2012 stating that her

15  "advice is to look on the Kaiser website every day. There are new positions posted each day." *Id.*

16  That same day, Plaintiff applied for numerous "nurse case manager" and "patient care coordinator"

17  positions, but she was either rejected as "not qualified" or on the ground that a more qualified

18  candidate had been selected. Ludovico Decl. ¶ 47.

19         Also on December 18, 2012, Mr. McMillan contacted the "Job Accommodation Network"

20  ("JAN") for suggestions on possible accommodations in light of Plaintiff's limitations. McMillan

21  Decl. ¶ 21. The JAN representative reviewed the essential job functions for the Staff II Nurse

22  position in the Emergency Department as well as Plaintiff's permanent restrictions. *Id.* The

23  problem JAN encountered was attempting to accommodate the "no patient care" restriction within

24  the emergency department. *Id.*

25         DMG provided its "Modified/Alternative Work Assessment" for Plaintiff on December 19,

26  2012. Docket No. 75, at 4. The report indicated that the "no direct patient care" limitation "limits

27  the employer's ability to provide modified work." *Id.* at 5. It further stated that Plaintiff had

28  indicated she was "not interested" in discussing modifications to her traditional job, and "instead

United States District Court

For the Northern District of California

1   wanted to focus on other jobs within Kaiser and how that process was conducted." *Id.* Ultimately,

2   Ms. Scott rendered the opinion that "the employer is not able to provide permanent modified work

3   within the employee's restrictions." *Id.* In examining whether alternative work was available, DMG

4   noted that "[i]n light of Ms. Ludovico's transferable skills and the restrictions noted above, it would

5   appear that the following positions might be appropriate as alternative jobs: Advice nurse, nurse care

6   manager, patient care coordinator." *Id.* at 6. Ms. Scott then looked at the then-open positions within

7   TPMG to determine if there were similar jobs available. While she noted a number of "[p]otentially

8   feasible" alternative jobs, she stated that "further research" was needed to determine if Plaintiff

9   could perform those jobs within her limitations. *Id.* Ultimately, she concluded that it was her

10  opinion "that the employer is unable to offer an alternative position to the employee at this time."

11  *Id.*

12        Plaintiff asserts that in December 2012, she learned that TPMG was training a number of

13  new hires for Advice Nurse positions. She emailed Mr. McMillan, Gretchen Scott, Ms. Hesse, and

14  Gayla Odle (a human resources representative) inquiring about these positions and why she had not

15  been notified of them. Ludovico Decl. ¶ 50. She claims that no one responded to her inquiries. *Id.*

16  Toni Groth, TPMG's Expert Recruitment Consultant, states that the positions to which Plaintiff

17  refers were filled in October 2012 – prior to Plaintiff being declared "permanent and stationary" by

18  her doctors. Declaration of Toni Groth ¶ 7 (Docket No. 62).

19        3.   <u>2013:  Interactive Placement Program Begins</u>

20        On January 7, 2013, Mr. McMillan and Ms. Shaffer discussed a possible referral of Plaintiff

21  to the Interactive Placement Program ("IPP"). Shafer Decl. ¶ 16; Docket No. 64-1, at 7. According

22  to Ms. Shafer, the IPP is part of the interactive process in which "employees who are unable to

23  return with or without accommodation to their existing positions." Shafer Decl. ¶ 16. Under the

24  IPP, disabled employees are assigned a disability recruiter for 90 days who discusses the employee's

25  preferences, assists in reviewing openings, and helps facilitate placement into positions for which

26  the employee is qualified (for example by "flagging" a disabled employee for preferential

27  consideration). *Id.* If the IPP process does not locate a new position, termination of the employee

28  may be required. *Id.*

United States District Court

For the Northern District of California

On January 8, 2013, Plaintiff emailed Mr. McMillan seeking information about where they were in the IPP and about the availability of an advice nurse position.  Ludovico Decl. ¶ 52.  A number of individuals, including Ms. Hesse and Gayla Odle (an HR representative) were copied on this email.  Docket No. 64-1, at 7.  In an internal response, Ms. Odle stated that Plaintiff's case should be on the "weekly Friday call" to review the action plan.  Docket No. 81-4, at 30.  Ms. Hesse replied that she agreed and that Plaintiff was not "off of our radar yet." *Id.*  She further stated "I am not going to answer this email, Ralph [McMillan] was very clear with her what the process was to find another position." *Id.*  Ms. Odle replied:

> Good.
>
> On Friday, the group should determine how and who to respond to this email.  She will accuse us of being unresponsive in an effort to refocus the light from her responsibilities.  Maybe we can somehow help her get a job at the [Advice Nurse Call Center] which I think will best suit her needs at this point.

*Id.* at 29.  Mr. McMillan responded to Plaintiff by stating that they were still attempting to determine whether they could "permanently accommodate [her] in [her] Emergency Department position." *Id.*; Docket No. 64-1, at 7.  Additionally, he sent her information on how she could apply for positions online. *Id.*

According to Mr. McMillan's deposition, either Ms. Shafer or the IP Committee determined that additional information was required in order to complete the referral.  McMillan Depo at 123: 20-25.  Mr. McMillan explained that "vague work restrictions" were problematic insofar as they could result in a broad range of potential work positions being eliminated from consideration.  McMillan Decl. ¶ 24; Shafer Decl. ¶ 16.  Accordingly, a letter was sent to Plaintiff on February 1, 2013, explaining that additional information was needed and enclosing a letter to Dr. Grant asking questions regarding Plaintiff's restrictions and how they impacted her ability to work.  McMillan Decl. ¶ 24.  The letter specifically requested that Dr. Grant "please indicate the specific restrictions/limitations (physical/psychological) pertaining to '*no direct care/contact to be done by the patient*.'  In other words, what aspects of 'direct care' or contact, with patients is Ms. Ludovico unable to perform, and which medical restrictions prevent her from performing them."  Docket No. 64-1, at 17 (emphasis in original).  The letter then requested specific information regarding whether

United States District Court

For the Northern District of California

1  she was able to perform "Direct patient care" in a limited way as well as whether she could perform

2  "indirect patient care" such as "consulting, assessments, data collection, formulating goal directed

3  care plan in person, via e-mail or phone." *Id.* at 17-18.[5]

4        On February 14, 2013, Dr. Grant apparently responded to the request for information by

5  providing a handwritten note that stated:

6          To Whom It May Concern:

7          Regarding Julieta Ludovico, please refer to the work restrictions as
           stated in the report by Agreed Medical Evaluator Dr. John Lavorgna
8          1/23/2013.  I defer to his work restrictions.
           Sincerely,

9          Douglas Grant MD

10

11  Docket No. 78, at 18.  This response did not contain any of the information or provide any guidance

12  on the questions asked by TPMG.

13        On February 21, 2013, DMG again provided a "Modified/Alternative Work Assessment."

14  Docket No 66-2, at 75.  DMG considered the revised limitations contained in a January 23, 2013

15  evaluation of Plaintiff by Dr. Lavorgna.  *Id.*  Again, the report indicated that it is "not a feasible to

16  remove direct patient care [from the Staff II Nurse in the emergency department position] as that

17  would remove essential functions from the job." *Id.* at 76.  As to the other limitations (the repetitive

18  use, lifting, and pushing and pulling limitations), the report indicated that certain modifications

19  (such as voice-activated software to avoid repetitive motions, lift devices, and alternating between

20  sitting and standing) could address the other limitations.  *Id.*  The "no direct patient care" limitation,

21

22       [5] The preface to this letter included the following description of the "interactive process" that
23  TPMG claims they had engaged in to that point.  Specifically, the letter stated:

24          During your leave we have engaged you in the interactive process
            which we provided you the following reasonable accommodations:
25          Temporary Transitional Work (TTW) based on restrictions outlined by
            your Primary Treating Provider as of November 6, 2011 through April
26          16, 2012, when it was interrupted as your restrictions did significantly
            improve, you were pending surgery and an extension beyond 90 days
27          in the TTW Program had already been made for a total of 150 days.
            Given this we mutual [sic] agreed to interrupt TTW.

28  Docket No. 64-1, at 15.

United States District Court

For the Northern District of California

1  however, was found to limit "the employer's ability to provide modified work." *Id.* Thus, it

2  reaffirmed the findings from the previous DMG report. *Id.*

3       On March 28, 2013, Dr. Grant filed another work status form which again stated that Ms.

4  Ludovico was "Permanent and Stationary" and listed the following work limitations "Per AME Dr.

5  Lavorgna":

6          The patient was able to lift 2 ½ pounds at counter level but not able to
        lift from floor level.  She would be able to push and pull 10 pounds.

7          She would not be able to do repetitive work with the right arm away
        from the body.  There were no left upper extremity restrictions.  There

8          were no driving restrictions.  No physical patient care was specified.
        Keyboarding and pushing were reasonable for one hour with a five-

9          minute break.

10          It is medically reasonable for this patient to take temperature and
        blood pressure readings.  She can take and record a medical history.

11          She can escort patients to and from examination rooms.  She can
        administer medication.  There are limitations on lifting, carrying,

12          keyboarding, mousing, pushing, pulling and working above shoulder
        level or with the right arm away from the body, as stated above.

13

14  Docket No. 78, at 19.

15       On April 16, 2013, a "work search meeting" was held with, among other individuals, Ms.

16  Hesse, Plaintiff, Gretchen Scott, Claudia Shafer, and Mr. McMillan.  McMillan Decl. ¶ 28.  Mr.

17  McMillan contends that six days later on April 22, 2013, he received DMG's most recent report

18  indicating that "there was still no available modified/alternative work." *Id.* On April 23, 2013, Mr.

19  McMillan emailed Ms. Shafer requesting that Plaintiff be placed into the IPP.  Docket No. 63-1, at

20  10.  Approximately three weeks later on May 15, 2013, Mr. McMillan called Plaintiff to inform her

21  that the "IPP team was requesting more information regarding her permanent restrictions."

22  McMillan Decl. ¶ 29; Ludovico Decl. ¶ 56.  He acknowledged that these were the same questions

23  TPMG had asked before (in early February), but it had "not received the requested information."

24  McMillan Decl. ¶ 29.  Accordingly, notwithstanding Dr. Grant's March 28, 2013 status report,

25  McMillan requested that Plaintiff have Dr. Grant fill out the form he had initially sent on February 1,

26  2013.  Ludovico Decl. ¶ 56.

27       Plaintiff provided the requested information from Dr. Grant the following day.  McMillan

28  Decl. ¶ 30; Ludovico Decl. ¶ 56.  In describing the "no direct patient care" limitation, Dr. Grant

**United States District Court**
For the Northern District of California

1    stated that this would "involve pushing, pulling, turning, lifting, or other physical activity that would

2    cause re-injury or exacerbation of her current industrial injury." Docket No. 78, at 22. However,

3    Dr. Grant stated that Plaintiff could perform "indirect patient care" as Mr. McMillan had defined it

4    in his February 1, 2013 request for information (consulting, assessments, data collection,

5    formulating goal directed care plan in person, etc.). *Id.* at 23. Dr. Grant closed by providing a

6    projected return to work date of May 15, 2013 and stating "we have always encouraged modified

7    duty/restrictions but her employer removed her from work." *Id.* at 23.

8        The following day, May 17, 2013, Ms. Shafer and Mr. McMillan determined that further

9    information was needed from Dr. Grant – specifically, regarding how he defined "repetitive."

10   McMillan Decl. ¶ 30; Shafer Decl. ¶ 24. Mr. McMillan contacted Plaintiff and informed her that the

11   additional information was needed. McMillan Decl. ¶ 30; Ludovico Decl. ¶ 57. Dr. Grant

12   responded to the request for clarification on May 22, 2013, stating that "repetitive means the act or

13   an instance of repeating or being repeated." Docket No. 78, at 26. Once Mr. McMillan received this

14   clarification, the information was forwarded on to Ms. Shafer and, on June 4, 2013, Ms. Shafer, Mr.

15   McMillan and an individual named JoLani Hironaka held a conference regarding the IPP submission

16   for Ms. Ludovico. McMillan Decl. ¶ 31. The following day, Ms. Hironaka approved the

17   submission. *Id.*

18       On June 20, 2013, the initial IPP meeting was held with Plaintiff, Mr. McMillan, Ms. Shafer,

19   and Antoinette Carter (a disability recruiter) participating. McMillan Decl. ¶ 32; Ludovico Depo. at

20   93:1-24. As a result of this call, a "90 Day Alternate Job Search Process" was initiated. Ludovico

21   Decl. ¶ 59; Ludovico Depo. at 143:15-144:7. The purpose of this search process was to locate

22   another job other than the Staff Nurse II Emergency Department position that Plaintiff had filled

23   prior to her injury. Ludovico Depo. at 144:10-17. Plaintiff maintains that Ms. Carter – despite

24   being her disability recruiter charged with assisting her in obtaining a new position within TPMG –

25   did little to nothing to assist her. Ludovico Decl. ¶ 61.

26       After the IPP process began, Plaintiff applied for an Advice Nurse position with TPMG in

27   Vallejo. Ludovico Decl. ¶ 63. TPMG accepted her application and she commenced working as an

28

18

United States District Court

For the Northern District of California

1  Advice Nurse on September 9, 2013 – eleven months after she her restrictions were deemed

2  "permanent."  Ludovico Decl. ¶ 64.

3       Ms. Ludovico's first amended complaint asserts ten causes of action[6]:  First, (1) Sexual

4  harassment in violation of Title VII (count 1); (2) a claim for retaliation for opposing sexual

5  discrimination and harassment in violation of Title VII (count 3); (3) disability discrimination in

6  violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (count 4); (4) retaliation

7  in violation of the ADA (count 5); (5) sexual and disability discrimination and harassment in

8  violation of FEHA, Cal. Gov. Code  § 12940 (count 9); (6) failure to take reasonable steps to prevent

9  discrimination and harassment in violation of FEHA (count 10); (7) failure to provide reasonable

10 accommodation to a disabled employee in violation of FEHA (count 11); (8) failure to engage in the

11 interactive process with disabled employee in violation of FEHA (count 12); (9) retaliation in

12 violation of FEHA (count 14); and (10) retaliation in violation of public policy (count 15).  TPMG

13 has moved for summary judgment on all counts.

14                    **III.   DISCUSSION**

15       Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if

16 the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

17 affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

18 party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue of fact is genuine

19 only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See*

20 *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of

21 evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for

22 the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence must be viewed in

23 the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the

24 nonmovant's favor.  *See id.* at 255.

25 _____

26      [6] Originally, the FAC asserted fifteen causes of action.  On May 20, 2014, the Court granted
   the parties' stipulation dismissing the causes of action asserting race/national origin discrimination
27 under Title VII, age discrimination, retaliation, race discrimination under 42 U.S.C.  § 1981, and age
   discrimination under California law.  Docket No. 59.  Further, the parties stipulated to the dismissal
28 of Ms. Ludovico's ninth cause of action to the extent it alleged age discrimination and race
   discrimination under California law.  Docket No. 59.

1    Where the movant has the ultimate burden of proof at trial, it may prevail on a motion for

2   summary judgment only if it affirmatively demonstrates that there is no genuine dispute as to every

3   essential element of its claim.  *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d

4   474, 480 (9th Cir.2000).  Once it has met the initial burden of showing the absence of any genuine

5   dispute, the burden shifts to the opposing party to present "'significant probative evidence tending to

6   support its claim or defense.'"  *Id.* (quoting  *Intel Corp. v. Hartford Accident & Indem. Co.*, 952

7   F.2d 1551, 1558 (9th Cir.1991)).  In contrast, where the nonmovant has the ultimate burden of proof,

8   the movant may prevail on a motion for summary judgment simply by pointing to the nonmovant's

9   failure "to make a showing sufficient to establish the existence of an element essential to [the

10  nonmovant's] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265

11  (1986).

12  A.   <u>TPMG Is Entitled to Summary Judgment as to Plaintiff's Claims Arising Out of the Alleged</u>

13       <u>Sexual Harassment Incident</u>

14       Plaintiff has asserted a cause of action alleging sexual harassment in violation of Title VII

15  and FEHA.  In addition, a number of Plaintiff's causes of action include allegations that TPMG

16  retaliated against Plaintiff in violation of FEHA and Title VII for complaining about the sexual

17  harassment and discriminated against/failed to accommodate the mental disability she suffered as a

18  result of the incident.  Plaintiff has failed to present evidence in support of these claims sufficient to

19  create a genuine dispute of material fact.

20       1.   <u>Plaintiff's Sexual Harassment Claims Fail as the Alleged Incident Was Not "Severe"</u>

21            <u>or "Pervasive"</u>

22       Plaintiff's first cause of action asserts a claim for sexual harassment in violation of Title VII,

23  42 U.S.C. § 2000e.  FAC ¶¶ 48-57.  Plaintiff's ninth cause of action similarly asserts a claim of

24  sexual harassment under California's Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code

25  § 12940.  Plaintiff must plead and prove materially similar elements in order to prevail on a sexual

26  harassment claim under Title VII and FEHA.  Specifically, she must prove: (1) that she was

27  subjected to verbal or physical conduct of a sexual nature; (2) that the conduct was unwelcome; and

28  (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's

1    employment and create an abusive work environment.  *See Vasquez v. County of Los Angeles*, 349

2    F.3d 634, 642 (9th Cir. 2003); *see also Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir.

3    2000) ("While Brooks argues that she was subjected to sexual discrimination under Title VII as well

4    as FEHA, we need only assess her claim under federal law because Title VII and FEHA operate

5    under the same guiding principles."); *Aguilar v. Avis Rent A Car System, Inc.*, 980 P.2d 846, 851

6    (Cal. 1999) (in discussing sexual harassment claims under Title VII, noting that "California courts

7    have adopted the same standard in evaluating claims under the FEHA").

8         To establish a claim of sexual harassment, the plaintiff must prove she was subjected to

9    conduct which was "sufficiently severe or pervasive to alter the conditions of the plaintiff's

10   employment and create an abusive work environment."  *Vasquez*, 349 F.3d at 642.  California courts

11   employ the same "severe or pervasive" test under FEHA.  *See, e.g.*, *Lyle v. Warner Bros. Television*

12   *Prods.*, 38 Cal.4th 264, 278-79 (2006) (discussing the Title VII severe or pervasive standard and

13   then stating that "California courts have adopted the same standard for hostile work environment

14   sexual harassment claims under the FEHA").  Determining whether the conduct at issue was so

15   pervasive or severe as to create an "abusive work environment" entails both a subjective and

16   objective inquiry – courts "consider not only the feelings of the actual victim, but also 'assume the

17   perspective of the reasonable victim.'"  *E.E.O.C. v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 998

18   (9th Cir. 2010) (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000)); *see also*

19   *Vasquez*, 349 F.3d at 642 ("[T]he working environment must both subjectively and objectively be

20   perceived as abusive." (citation omitted)); *Haberman v. Cengage Learning, Inc.*, 180 Cal. App. 4th

21   365, 379 (2009) (same under FEHA).  This requirement is in the disjunctive – the conduct need only

22   be severe *or* pervasive.  *See Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000)

23   ("Harassment need not be severe *and* pervasive to impose liability; one or the other will do.").

24        Whether Plaintiff's working environment had become "abusive" requires a totality of the

25   circumstances analysis, which may include, among others, the following factors:

26             •    The frequency of the discriminatory/harassing conduct;

27             •    The severity of the conduct;

28

- • Whether the conduct was physically threatening humiliating, or a mere offensive utterance; and

- • Whether it unreasonably interferes with an employee's work performance

*Prospect Airport*, 621 F.3d at 999 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  No single factor is indispensable.  *Id.*  For instance, a "single incident of severe abuse can constitute a hostile work environment."  *See, e.g.*, *Freitag v. Ayers*, 468 F.3d 528, 540 (9th Cir. 2006).

In this case, the alleged harassment cannot be deemed "pervasive" as Plaintiff has not alleged any harassing act beyond the single incident with Kevin.  *See, e.g.*, *Etter v. Veriflo Corp.*, 67 Cal. App. 4th 457(1999) ("Under the [severe or pervasive] standard, trivial (i.e., not severe) or occasional, sporadic or isolated (i.e. not pervasive) incidents of verbal abuse are not actionable."); *Creamer v. Laidlaw Transit, Inc.*, 86 F.3d 167, 170 (10th Cir. 1996) ("This single incident does not, by any means, amount to pervasive sexual harassment.").  Plaintiff has provided the declaration of a coworker, Ms. Brooks, attesting to the fact that Kevin had previously acted "aggressively."  This declaration, however, does not create a genuine dispute of material fact as to whether the alleged harassing conduct was "pervasive."  First, Ms. Brooks' declaration does not reference any prior act of sexual misconduct by Kevin or any other coworker.  Second, Plaintiff has not argued that she or any other coworker was subjected to sexually harassing conduct besides the isolated incident with Kevin.

The question, therefore, is whether Kevin's behavior was so "severe" as to have altered the conditions of her employment.  The Court concludes that it did not.  First, Kevin did not serve as Plaintiff's supervisor or otherwise have authority over her.  A single incident of inappropriate conduct by a coworker, as opposed to a supervisor, is less likely to meet Title VII's [and FEHA's] "severity" requirement.  *See, e.g.*, *Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000) ("Because the employer cloaks the supervisor with authority, we ordinarily attribute the supervisor's conduct directly to the employer.  Thus, a sexual assault by a supervisor, even on a single occasion, may well be sufficiently severe so as to alter the conditions of employment and give rise to a hostile work environment claim." (citation omitted)); *see also Gant v. Kash n' Karry Food Stores, Inc.*, No. 8:07-cv-2086-T-33EAJ, 2009 WL 2163111 (M.D. Fla. July 17, 2009) ("Conduct by a co-worker is

**United States District Court**
For the Northern District of California

1   less likely to be actionable harassment because unlike a supervisor, a co-worker usually does not

2   have the opportunity to exert influence on or exercise authority over another of equal rank.").

3          Second, while the record demonstrates that Plaintiff subjectively felt that her work

4   environment was abusive following the incident with Kevin, she has failed to demonstrate that these

5   feelings were objectively reasonable for purposes of Title VII or FEHA.  The incident as issue was

6   an isolated occurrence – Plaintiff has presented no examples of sexually abusive conduct in her

7   workplace either before, or after, the incident with Kevin.  As the Ninth Circuit has previously held:

8              Because only the employer can change the terms and conditions of
               employment, an isolated incident of harassment by a co-worker will
9              rarely (if ever) give rise to a reasonable fear that sexual harassment
               has become a permanent feature of the employment relationship.

10

11   *Brooks*, 229 F.3d at 924.  Thus, the court noted that "[i]f a single incident *can ever* suffice to support

12   a hostile work environment claim, the incident must be *extremely severe*."  *Id.* at 926 (emphases

13   added); *see also Hosteler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000) *(*"[I]ntimate or

14   more crude physical acts – a hand on the thigh, a kiss on the lips, a pinch of the buttocks – may be

15   considered insufficiently abusive to be described as 'severe' when they occur in isolation.")

16   Consistent with this approach, a number of circuit courts have found a single incident of sexual

17   misconduct (including conduct more explicit and abusive than is alleged in this action) to be

18   insufficiently "severe" for purposes of Title VII.

19          For instance, in *Brooks*, the Ninth Circuit the plaintiff was a 911 dispatcher who, while

20   responding to a 911 call, had the following done to her by a fellow dispatcher:

21             He forced his hand underneath her sweater and bra to fondle her bare
               breast.  After terminating the call, Brooks removed Selvaggio's hand
22             again and told him that he had "crossed the line."  To this, Selvaggio
               responded "you don't have to worry about cheating [on your husband],
23             I'll do everything."  Selvaggio then approached Brooks as if he would
               fondle her breasts again.  Fortunately, another dispatcher arrived at
24             this time, and Selvaggio ceased his behavior.

25   *Brooks*, 229 F.3d at 924.  The court determined this was not sufficiently severe, contrasting the case

26   from one where the plaintiff was raped and held captive overnight:

27             Brooks did not allege that she sought or required hospitalization;
               indeed, she did not suffer any physical injuries at all.  The brief
28             encounter between Brooks and Selvaggio was highly offensive, but

United States District Court

For the Northern District of California

1
2
3
4
5
6

> nothing like the ordeal suffered by the unfortunate young woman in *Al Dabbagh* [*v. Greenpeace, Inc.*, 873 F. Supp. 1105, 1108 (N.D. Ill. 1994)]. . . .  Utilizing the *Harris* factors of frequency, severity and intensity of interference with working conditions, we cannot say that a reasonable woman in Brook's position would consider the terms and conditions of her employment altered by Selvaggio's actions.  Brooks was harassed on a single occasion for a matter of minutes in a way that did not impair her ability to do her job in the long-term, especially given that the city took prompt steps to remove Selvaggio from the workplace.

7    *Id.* at 926.  Similarly, in *Hockman v. Westward Communications, LLC*, 407 F.3d 317 (5th Cir. 2004),

8    a co-worker, among other things, grabbed the plaintiff's "breasts and behind" and "once held her

9    cheeks and tried to kiss her."  *Id.* at 328.  The court found these actions insufficient to state a hostile

10   work environment claim.  *Id.*  Finally, in *LeGrand v. Area Resources for Community & Human*

11   *Services*, 394 F.3d 1098 (8th Cir. 2005), the court found no severe or pervasive harassment where

12   three isolated incidents occurred over a nine-month period.  *Id.* at 1102.  The Eighth Circuit reached

13   this conclusion despite the fact that one of the "isolated incidents" where a priest with whom the

14   plaintiff worked kissed the plaintiff on the mouth, grabbed the plaintiff's buttocks, reached for

15   plaintiff's genitals, and suggested that the plaintiff engage in sexual activity with him.  *Id.* at 1100.

16       In addition to these more extreme examples, a number of courts have found isolated events

17   more similar to that involved in this case to be non-actionable.  *See, e.g.*, *Nicols v. Mich. City Plant*

18   *Planning Dep't*, No. 13-2893, 2014 WL 2766776, at *4 (7th Cir. 2009) (single time use of the n-

19   word directed at plaintiff insufficiently severe for racially hostile work environment); *see also Bruce*

20   *v. Fair Collections & Outsourcing*, No. CCB-13-3200, 2014 WL 3052477 (D.Md. June 30, 2014)

21   (no severe or pervasive sexual harassment where a coworker asked plaintiff if he needed a hug, on

22   two different occasions touched his head, neck, and shoulders, and on another occasion touched his

23   belt); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 97-98 (D.D.C. 2007) (no harassment

24   where Plaintiff alleged that a co-worker "touched her buttocks, and tried to kiss her").  California

25   courts are in accord.  *See, e.g.*, *Hughes v. Pair*, 46 Cal. 4th 1035 (1035)

26       Kevin's behavior was unquestionably inappropriate.  No employee should ever be subjected

27   to unwanted physical contact by anyone – co-worker or supervisor – while at work.  However,

28   unlike the cases cited above, Kevin's alleged conduct did not include any sexual fondling or

**United States District Court**
For the Northern District of California

1    intrusive touching which had sexual overtones.  "[N]ot all workplace conduct that may be described

2    as harassment affects a term, condition, or privilege of employment within the meaning of Title

3    VII." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation marks and citation

4    omitted).  The alleged isolated incident here, while inappropriate and in another context could give

5    rise to a harassment claim, did not rise to the level of severe harassment that is actionable under Title

6    VII or FEHA.  Accordingly, TPMG's motion for summary judgment is **GRANTED** as to Plaintiff's

7    sexual harassment claims under Title VII and FEHA.

8                 2.       TPMG Is Entitled to Summary Judgment on Plaintiff's Claims Alleging Retaliation

9                          for Reporting Sexual Harassment

10          Plaintiff's fourteenth cause of action alleges that TPMG unlawfully retaliated against her

11   because of her sexual harassment complaint in violation of FEHA and Title VII.  To state a prima

12   facie case for retaliation under either statutory provision, Plaintiff must establish: (1) involvement in

13   a protected activity; (2) an adverse employment action, and (3) a causal link between the two.

14   *Brooks*, 229 F.3d at 928; *see also Mamaou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686 (2008)

15   (noting similar elements under FEHA).  If she is able to establish this prima facie case, the burden

16   shifts to TPMG to demonstrate that the "challenged action was taken for legitimate, non-

17   discriminatory reasons."  *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011).  If TPMG

18   proffers a legitimate, non-discriminatory reason, Plaintiff must then establish that the asserted reason

19   is "merely a pretext for impermissible discrimination."  *Id.*

20          "Protected activity" includes asserting ones civil rights by complaining of harassing conduct.

21   *See Brooks*, 229 F.3d at 928.  In this action, TPMG has not disputed that Ms. Ludovico's complaint

22   regarding Kevin's behavior constitutes "protected activity."  Accordingly, the Court next turns to

23   whether Ms. Ludovico experienced an "adverse employment action" motivated by a retaliatory

24   animus.

25          Not every employment action which can be construed as "adverse" is actionable under either

26   Title VII or FEHA.  Rather, "a plaintiff must show that a reasonable employee would have found the

27   challenged action materially adverse, 'which in this context means it well might have dissuaded a

28   reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa*

United States District Court

For the Northern District of California

*Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  This is an objective test – "[w]hat matters is whether [the challenged action] might dissuade a reasonable employee from complaining about discrimination."  *Morrow v. City of Oakland*, No. C11-02351 LB, 2012 WL 2133755, at *13 (N.D. Cal. June 12, 2012).

Plaintiff contends that the following acts constitute retaliatory acts in response to her filing of a sexual harassment complaint: (1) refusing to transfer Kevin; (2) failing to return her calls when she experienced Kevin in the emergency department; and (3) sequestering her in a conference room whenever Kevin needed to be in the emergency department.  First, the Court finds that the failure to transfer Kevin does not constitute a materially adverse action.  As detailed above, Plaintiff, her managers, the radiology department managers, and respective unions reached an agreement in response to Kevin's actions.  This agreement kept Kevin from certain areas of the emergency department and required him to provide advance notice whenever his duties brought him into the emergency.  Further, Plaintiff testified in her deposition that, at least initially, she did not request that Kevin be terminated or transferred as a result of the incident.  Ludovico Depo. at 299:20-25.

Second, Plaintiff cites only a single instance of her calls regarding Kevin being unanswered.  Specifically, she claims that on March 17, 2010, she saw Kevin in the emergency department and was "frozen with fear" and called Ms. Lacy and emergency department managers to inform her that Kevin was in the emergency department but she did not hear a response.  Ludovico Decl. ¶ 10.[7]  However, Ms. Lacy responded to Plaintiff's follow up email on Plaintiff's next day of work in the emergency department, *id.* ¶¶ 11, 12, and the meeting which resulted in the agreement discussed above occurred the following day, Lacy Decl. ¶ 9.  The record does not support Plaintiff's contention that TPMG failed to respond to her calls regarding her encounter with Kevin.

Finally, the Court finds that the two instances in which Plaintiff was asked to go into a conference room while Kevin performed a portable x-ray exam is insufficient to support her retaliation claim.  These instances were not sufficiently material to constitute an adverse

---

[7] To the extent Ms. Ludovico's complaint is that she did not *immediately* receive a response to her call, the Court notes that the March 17, 2010 incident allegedly occurred at 2:30 a.m.  Ludovico Decl. ¶ 10. .

employment action.  Even if they were, Plaintiff has failed to demonstrate that they were motivated

by retaliatory animus.  The record reveals that after the agreement was entered into with Plaintiff,

her union, and all applicable parties, all supervisors were instructed, among other things:

> When Kevin is on duty and if the other X-ray tech is not available, and
> a stat portable x-ray is ordered in the ED, Kevin is required to call the
> ED Supervisor or if he cannot reach them by phone, he must stop by
> the Supervisor's desk to notify them that he his coming.  The
> Supervisor or Asst Mgr on duty will accompany/supervise Kevin
> while he is in the ED ensuring that any interactions with Julie are
> absent or minimal and are appropriate.

Docket No. 65-1, at 20.  The record further reveals that when Nurse Wilson asked Plaintiff to go into

the conference room, she had not yet read the above – rather, she was operating under Kevin's

description of the agreement that he was "not to have any contact with Julie."  Docket No. 65-1, at

24; *see also id.* (noting that the incidents of Plaintiff being taken to a conference room occurred

"[p]rior to reading the e-mail in the assistant manager binder").  Hence, the purpose was to protect

Plaintiff, not retaliate against her.

Additionally, Nurse Wilson stated that she removed Plaintiff from her patients in these two

instances for the benefit of the [patients] care."  *Id.*  This conclusion is supported by the record.  As

evident from the parties' agreement, quoted above,  Kevin's presence in the emergency department

was limited to circumstances when an immediate portable x-ray was ordered by a doctor and there

was not another x-ray technician to provide the service.  In these *narrow* circumstances, ensuring

that patient care was not disrupted was a legitimate, non-discriminatory, reason for removing

Plaintiff from her patients.

The Court is aware that the "collective series of retaliatory acts may constitute sufficient

adverse employment action even if some of the acts individually would not."  *Wysinger v.*

*Automobile Club of S. Cal.*, 157 Cal. App. 4th 413, 423 (2007).  Here, however, Plaintiff has failed

to demonstrate both a materially adverse employment action and the requisite causal nexus between

the challenged actions and her protected activity.  Accordingly, TPMG's motion for summary

judgment will be **GRANTED** as to Plaintiff's third and fourteenth causes of action to the extent they

are based on alleged retaliation for her sexual harassment complaint.

**United States District Court**
For the Northern District of California

3.   TPMG Is Entitled to Summary Judgment on Plaintiff's Causes of Action Relating to Her Alleged Mental Disability

Plaintiff asserts two theories of liability based on TPMG's alleged actions (or failure to act) in light of Ms. Ludovico's purported mental disability resulting from the encounter with Kevin. First, Plaintiff's fourth and ninth cause of action include allegations that TPMG "failed to accommodate" her mental disability in violation of the ADA and FEHA. Second, Plaintiff's fourth and eleventh cause of action include allegations that TPMG failed to engage in the interactive process regarding the mental disability in violation of the ADA and FEHA.

Both the ADA and FEHA require an employer to provide reasonable accommodations to a disabled employee. Implicit in these statutory duties is that the employer actually *know* of the alleged disability in question. Without such knowledge, an employer cannot be faulted for failing to accommodate the disability, nor can it be said to have taken any action *because* of the mental disability. *See, e.g.*, *Prilliman v. United Air Lines, Inc.*, 53 Cal. App. 4th 935, 954 (1997) (noting that an employer is not ordinarily liable for "failing to accommodate a disability of which it had no knowledge"); *see also Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996) ("An employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations . . . .").

In order to state a prima facie case for failure to accommodate under the ADA, Plaintiff must establish: (1) She is disabled within the meaning of the ADA; (2) she is a qualified individual able to perform the essential functions of the job with reasonable accommodation," and (3) she suffered an adverse employment action because of the disability. *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012). FEHA imposes similar requirements. *See, e.g.*, *Cuiellette v. City of Los Angeles*, 194 Cal. App. 4th 757 (2011) (noting similar elements under FEHA). Neither the ADA nor FEHA require an employer requires an "'employer to choose the best accommodation or the specific accommodation a disable employee or applicant seeks'; only a 'reasonable' one." *Capote v. CSK Auto, Inc.*, No. 12-cv-02958-JST, 2014 WL 1614340, at *6 (N.D. Cal. Apr. 22, 2014) (quoting *Raine v. City of Burbank*, 135 Cal. App. 4th 1215, 1222 (2006)). In fact, the "Appendix to the ADA regulations explains that the 'employer providing the accommodation has the ultimate

**United States District Court**
For the Northern District of California

1   discretion to choose between effective accommodations, and may choose the less expensive

2   accommodation or the accommodation that is easier for it to provide.'" *See Hankins v. The Gap,*

3   *Inc.*, 84 F.3d 797, 800 (6th Cir. 1996).  "'An employee cannot make his employer provide a specific

4   accommodation if another accommodation is instead provided,'" so long as that accommodation is

5   reasonable and effective. *Houston v. Regents of Univ. of Cal.*, No. C04-4443 PJH, 2006 WL

6   1141238, at *29 (N.D. Cal. May 1, 2006) (quoting *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th

7   215, 228 (1999)).

8           Finally, when an employee requests an accommodation for a disability, or the employer

9   recognizes the need for an accommodation, an employer has a mandatory obligation to engage in the

10   interactive process." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000), *rev'd on other*

11   *grounds* 535 U.S. 391 (2002).  The interactive process "requires communication and good-faith

12   exploration of possible accommodations between employers and individual employees." *Id.* at 1114.

13   Accordingly, it requires "(1) direct communication between the employee to explore in good faith

14   the possible accommodations; (2) consideration of the employee's request; and (3) offering an

15   accommodation that is reasonable and effective." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080,

16   1089 (9th Cir. 2002).

17           Assuming that Plaintiff has established that she suffered from a mental disability covered by

18   the ADA and FEHA, TPMG is nonetheless entitled to summary judgment because there is no

19   genuine dispute of fact as to whether TPMG failed to provide Plaintiff a reasonable accommodation

20   after a good faith, interactive process.  Immediately following the incident with Kevin, an

21   investigation was held, witnesses were interviewed, and Kevin was suspended.  When Plaintiff

22   experienced continued distress at seeing him in the emergency department, a meeting was held

23   between TPMG management, union representatives, and Plaintiff.  As a result of this meeting, an

24   agreement was reached to try to accommodate Plaintiff.  When, in Plaintiff's opinion, that agreement

25   proved unworkable, another meeting was held in which her request to have Kevin transferred was

26   discussed.  Initially, all participants agreed on a course of action that did not require Kevin be

27   transferred.  While Plaintiff later requested that Kevin be transferred, the record reveals that

28   Plaintiff's request was considered but deemed unwarranted in light of TPMG's investigation into the

United States District Court

For the Northern District of California

1   incident.  Plaintiff does not provide any evidence to support her contention that transferring or firing

2   Kevin was justified.  Ultimately, Plaintiff was placed on medical leave while her job remained open.

3   Courts have recognized that unpaid medical leave may constitute a reasonable accommodation under

4   the ADA.  *See Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999).  Finally,

5   Plaintiff stated that if Kevin could not be transferred, she wanted to be transferred to a different

6   facility.  Lacy Decl. ¶ 20; Ludovico Decl. ¶ 22, 23.  She was offered, and accepted, a position with a

7   different facility in June 2010.  In short, Plaintiff's alleged mental disability was in fact

8   accommodated.

9   　　　On this record, there is no genuine dispute of material fact as to whether Ms. Ludovico was

10   provided a reasonable accommodation in light of the mental disability she experienced as a result of

11   the September 17, 2010 incident with Kevin.  There is further no genuine dispute of material fact as

12   to whether this accommodation was the result of a good faith, interactive process.  Accordingly,

13   TPMG's motion for summary judgment is **GRANTED** as to Ms. Ludovico's fourth, ninth, and

14   eleventh causes of action failure to reasonably accommodate (or participate in an interactive process

15   regarding) her mental disability.

16   B.   TPMG Is Not Entitled to Plaintiff's Disability Discrimination Claims Relating to Her

17   　　　Physical Disability

18   　　　Ms. Ludovico asserts in her fourth, ninth, and eleventh causes of action that TPMG engaged

19   in disability discrimination resulting from her November 2011 injury.  In her opposition to summary

20   judgment, Ms Ludovico asserts that the basis of these claims is that: (1) TPMG failed to reasonably

21   accommodate her physical disability for over eighteen months (from April 2012 through

22   September 2013) and (2) failed to engage in an interactive process.  In addition, Plaintiff asserts that

23   TPMG retaliated against her for filing this lawsuit alleging disability discrimination.  The general

24   framework for these claims is the same as discussed above in the context of Ms. Ludovico's mental

25   disability.

26   　　　Plaintiff's claims that TPMG failed to reasonably accommodate her or engage in the good

27   faith interactive process appear problematic.  There are numerous facts in the record that are

28   inconsistent with her claim.  For example, TPMG placed Plaintiff on industrial leave and her

United States District Court

For the Northern District of California

1    position was held open for months while she treated with her physicians; and, as noted, unpaid

2    medical leave may constitute a reasonable accommodation.  *See Nunes*, 164 F.3d at 1247 ("Even an

3    extended medical leave . . . may be a reasonable accommodation . . . .").  In this case, TPMG

4    provided her TTWA for 150 days, well beyond the normal 90 day period.  Further, the record –

5    including Plaintiff's own declaration – contains no reference to Plaintiff ever complaining about

6    being on industrial leave or requesting an additional or different accommodation between April 2012

7    and September 2012.  *See Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155 (5th Cir. 1996) ("'In

8    general . . . it is the responsibility of the individual with the disability to inform the employer that an

9    accommodation is needed.'" (quoting 29 C.F.R. § 1630.9, App.)).  Additionally, during this time,

10   Plaintiff repeatedly submitted notes from her doctor indicating that she could not provide "direct

11   patient care" – a limitation that on its face appears to exclude a substantial number of potential

12   accommodations in a health care setting.  Finally, when Plaintiff became permanent and stationary,

13   TPMG hired an outside consultant to assist finding Plaintiff modified or alternative work.

14         However, "having a weak case is not a fatal flaw on summary judgment."  *Babai v. Allstate*

15   *Ins. Co.*, No. C12-1518 JCC, 2013 WL 6564353, at *5 (W.D. Wash. Dec. 13, 2013).  Whether a

16   specific accommodation was "reasonable" and whether an employer engaged in a good faith

17   interactive process with a disabled employee are traditional questions of fact.  *See, e.g.*, *E.E.O.C. v.*

18   *Convergys Customer Mgmt. Group, Inc.*, 491 F.3d 790 (8th Cir. 2007) ("Whether an accommodation

19   is reasonable is a question of fact to be decided by the jury."); *Poole v. Centennial Imports, Inc.*, No.

20   2:12-cv-00647-APG VCF, 2014 WL 2090810, at *7 (D. Nev. May 19, 2014) ("Whether Centennial

21   satisfied the statutory requirement of an interactive process is a question of fact for the jury.").

22         Taking the record and all possible inferences in the light most favorable to Plaintiff, a jury

23   could conclude that TPMG failed to sufficiently take the initiative to engage with Plaintiff through a

24   good faith interactive process to determine whether any reasonable accommodation would have

25   allowed her to return to work.  For example, once aware of a disability, the employer has the

26   obligation to "make a reasonable effort to determine the appropriate accommodation."  *See Cannice*

27   *v. Norwest Bank Iowa N.A.*, 189 F.3d 723, 727 (8th Cir. 1999).  "The interactive process, as its name

28   implies, requires the employer to take some initiative."  *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d

296, 315 (3d Cir. 1999).  A jury could conclude that TPMG failed to make the required reasonable effort when it allegedly did not engage Plaintiff or seek clarification of her work limitations between April and August 2012.  Similarly, a jury could find a lack of good faith or reasonable effort in light TPMG's delays in meeting with Plaintiff and insistence on obtaining clarification from Dr. Grant despite the reasonably clear nature of her limitations.  A jury may find that notwithstanding the apparent need for additional medical information, the eleven months it took to place Plaintiff in an acceptable position after her condition became permanent, evidences a failure of TPMG to make a reasonable and diligent effort to accommodate her.

The Court cannot conclude, as a matter of law, that TPMG met its statutory duty to engage in a good faith interactive process with Plaintiff in order to arrive at a reasonable accommodation. Accordingly, TPMG's motion for summary judgment is **DENIED** as to Plaintiff's failure to accommodate and reasonable accommodation claims.[8]

C.    Plaintiff Has Failed to Demonstrate the Existence of a Genuine Dispute as to Whether TPMG Retaliated Against Her for Filing Discrimination Complaints

Plaintiff  has also alleged in various causes of action that TPMG retaliated against for filing the instant action (and for filing a complaint with the EEOC and DFEH ) alleging disability discrimination.  She points to two facts: (1) that "within month [sic] of Plaintiff filing her complaint in this action" she was referred to the Interactive Placement Program and the reviewing committee "repeatedly refused to make the recommended referral . . . claiming to need additional clarification," and (2) an email string between Ms. Hesse and Ms. Odle which Plaintiff construes as "mocking [her] as a complainer."  Docket No. 82.

TMPG's request for additional information is insufficient circumstantial evidence of retaliatory animus.  The Ninth Circuit has commanded that when a plaintiff relies on circumstantial evidence of pretext, that evidence must be specific and substantial in order to defeat summary

---

[8] For similar reasons, TPMG's motion for summary judgment as to Plaintiff's request for punitive damages must be **DENIED**.  While negligent decision making or poor communication will not give rise to an award of punitive damages, *see Ngo v. Reno Hilton Resort Corp.*, 140 F.3d 1299, 1305 (9th Cir. 1998), a jury could potentially conclude that TPMG acted "in the face of a perceived risk that its actions . . . violate[d] federal law."  *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 536 (1999).

United States District Court
For the Northern District of California

judgment.  *See, e.g.*, *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998); *see also*

*Haley v. Cohen & Steers Capital Mgmt., Inc.*, 871 F. Supp. 2d 944 (N.D. Cal. 2012) (applying same

standard to ADA claims).  The simple fact that the request for information came after the filing of

this lawsuit does not give rise to a triable issue as to whether TMPG acted with retaliatory animus.

*See, e.g.*, *Caprio v. Mineta*, No. CIVA 04-5805 MLC, 2007 WL 2885815, at *9 (D.N.J. Sept. 27,

2007) ("Temporal proximity between the protected activity and allegedly retaliatory conduct may be

relevant, but the temporal proximity here is not unusually suggestive, and timing alone is rarely

sufficient to establish causation."); *see also Nadaf-Rahrov v. Neiman Marcus Group, Inc.*, 166 Cal.

App. 4th 952 (2008) (finding that "[t]emporal proximity does not alone satisfy" a plaintiff's burden

to show retaliatory intent); *Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1112 (2007)

("[T]emporal proximity, although sufficient to shift the burden to the employer to articulate a

nondiscriminatory reason for the adverse employment action, does not, without more, suffice also to

satisfy the secondary burden . . . to show a triable issue of fact on whether the employer's articulated

reason was untrue and pretextual.").  Additionally, it is tenuous, at best, to assert even temporal

proximity between Plaintiff's protected activity and TPMG's request for additional information.

While Plaintiff filed this action in August 2012, her complaints with the EEOC and DFEH were filed

April 27, 2010 and September 7, 2010.  FAC ¶¶ 2, 3.  Although the filing of this action is

undoubtedly protected activity, it was simply the latest in Plaintiff's string of filings with

enforcement agencies alleging disability discrimination.  Plaintiff does not claim or establish any

evidence of retaliatory action taken in response to the earlier filings with the EEOC and DFEH.

Viewed in light of the entire record, therefore, no reasonable inference of retaliation may be drawn

based on the timing of TPMG's request for information which occurred years after Plaintiff's

exercise of protected activity in filing complaints with outside agencies.

Finally, the e-mail string which Plaintiff believes shows TPMG personnel "mocking" her as

a complainer does not suggest any retaliatory intent.  Plaintiff's counsel's representation aside, the e-

mail on its face does not mock Plaintiff – it simply reflects the belief of the author that Plaintiff was

accusing TPMG of being unresponsive and that Plaintiff had failed to meet her responsibilities.

Undercutting any argument that this email illustrates a retaliatory animus on the part of TPMG is the

1  fact that Ms. Odle specifically suggested a way to help Plaintiff by stating: "Maybe we can

2  somehow help her get a job at the [Advice Nurse Call Center] which I think will best suit her needs

3  at this point."  Docket No. 81-4, at 29.

4        Beyond an unpersuasive temporal proximity, Plaintiff has failed to point to any evidence that

5  would support a jury finding of retaliatory animus.  Accordingly, TPMG's motion for summary

6  judgment is **GRANTED** as to Plaintiff's retaliation claims.

7                  **IV.**   **CONCLUSION**

8        For the foregoing reasons, the Court **GRANTS** TPMG's motion for summary judgment as

9  to: (1) Plaintiff's sexual harassment, failure to accommodate/interactive process, and retaliation

10  claims arising out of the February 2010 incident and (2) Plaintiff's retaliation claims based on

11  TPMG's response to her physical disability.  The Court **DENIES** TPMG's motion for summary

12  judgment on Plaintiff's failure to accommodate/interactive process claims relating to Plaintiff's

13  November 2011 injury as well as Plaintiff's request for punitive damages.

14        This order disposes of Docket No. 61.

15

16        IT IS SO ORDERED.

17

18  Dated:  July 25, 2014

19                              _____

20                              EDWARD M. CHEN
                               United States District Judge

21

22

23

24

25

26

27

28